AO 91 (Rev. 11/11)  Criminal Complaint   (modified by USAO for telephone or other reliable electronic means)

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| United States of America | ) |
|---|---|
| v. | ) |
| Stanislav "Stas" Grinberg | ) Case No. 1:25-MJ-00245 |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __Dec. 2022 through Nov. 2024__ in the county of __Hamilton__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud and Bank Fraud |
| 18 U.S.C. § 1014 | Making False Statements on Loan Applications |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Nicole Lutz, Postal Inspector, USPIS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __FaceTime video conference__ *(specify reliable electronic means)*.

Date: __Mar 19, 2025__

_____
*Judge's signature*

City and state: __Cincinnati, Ohio__    Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# CRIMINAL COMPLAINT AND ARREST WARRANT

The undersigned, Nicole Lutz, being first duly sworn deposes and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of a criminal complaint and arrest warrant for Stanislav "Stas" Grinberg for violations of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud) and 18 U.S.C. § 1014 (Making False Statements on Loan Applications).

2. I am a United States Postal Inspector, having been so employed since May 2015. I am presently assigned to the Cincinnati Field Office, Pittsburgh Division of the United States Postal Inspection Service (USPIS) with investigative responsibility for southwest Ohio and northern Kentucky. I have gained experience through completion of the Basic Inspector Training (BIT) in August of 2015. During BIT, I was instructed in all phases of criminal investigation, such as criminal law, search and seizure, field enforcement techniques, firearms proficiency, electronic media investigations, interviewing and evidence collection. Since August 2015, I have worked with various federal, state, and local law enforcement agencies in the prosecution of crimes involving the U.S. Mail and the U.S. Postal Service, including but not limited to mail fraud, bank fraud, mail theft, robberies, and workplace violence investigations.

3. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

Consequently, I am an "investigative or law enforcement officer of the United States," within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

4. I am familiar with the facts and circumstances of this case. The information contained in this affidavit is either personally known to me, based upon surveillance, my interview of various witnesses and review of various records/tracking data and publicly available information, or has been relayed to me by other agents or sworn law enforcement personnel.

5. Because this affidavit is provided for the limited purpose of establishing probable cause to support a criminal complaint and arrest warrant, I have not included all details and aspects known by this investigation, but rather, I have set forth only those facts that I believe are necessary to establish probable cause.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud) and 18 U.S.C. § 1014 (Making False Statements on Loan Applications) have been committed by Grinberg in connection with loans related to multi-family residential rental properties.

**STATEMENT OF PROBABLE CAUSE**

**Background Related to Multi-Family Properties & Commercial Lending**

7. Generally speaking, multi-family properties are residential properties with multiple housing units contained within one building or several buildings within

2

one complex. Certain business entities acquire and manage multi-family properties as investments or sources of direct income. These businesses can derive direct income from multi-family properties through the collection of rent from tenants and they can derive investment income by refinancing the properties and getting cash out at closing or by selling the properties which value may increase over time.

8. In acquiring multi-family properties through real estate transactions, business entities often secure loans from lenders that will finance the acquisition of the property.

9. When considering whether to issue a loan to a business entity seeking to purchase a multi-family property, prospective lenders often evaluate a number of factors, including the purchase price, the financial performance of the buildings (i.e. rents collected), ownership and that the properties will be unencumbered or free from any legal claims at closing.

10. Additionally, when the lender issues a loan to a borrower for purposes of acquiring a multi-family property, the property itself is frequently pledged as collateral for the loan, meaning that, in the event of the borrower's default on the loan, the lender has the power to foreclosure upon and sell the property to satisfy the loan. Accordingly, many loans require that the lender is in the first lien position (i.e. that the lender is the first party to receive proceeds from the sale of the property in the event of foreclosure) and that there are no other outstanding debts or obligations on the property when the loan is funded.

## Relevant Individuals, Entities, and Definitions

11. Stanislav Grinberg – Founder of Vision & Beyond, LLC and other entities involved in facilitating the alleged fraud scheme. Sponsor of the Corevest VNB I and VNB II Loans issued to the borrowers Cincinnati Portfolio Holdings VNB I, LLC., and Cincinnati Portfolio Holdings VNB II, LLC.

12. Peter Gizunterman – Founder of Vision & Beyond, LLC and other entities involved in facilitating the alleged fraud scheme. Sponsor of the Corevest Loans issued to the borrowers Cincinnati Portfolio Holdings, VNB I LLC, and Cincinnati Portfolio Holdings VNB II, LLC.

13. Vision & Beyond, LLC – Cincinnati-based multi-family real estate investment company owned by Grinberg and Gizunterman founded in 2019.

14. Corevest American Finance LLC – Original Holder of the VNB I and VNB II loans issued in December 2022. Both loans total approximately $36 million dollars secured by multi-family properties in Hamilton County and Montgomery County, Ohio.

15. Generally speaking, a "rent roll' is a spreadsheet listing, among other things: (1) all the tenants in a multi-family property during a specific time frame, (2) the amount of rent paid by each tenant, and (3) the total rental income for the property during the time frame. The rent roll often includes the date the tenant began occupying the apartment listed on the rent rolls and the various components of each tenant's payments towards apartment rent, pet rent, storage rent, parking or garage rent and cable charges among others.

## V&B's Alleged Fraud

16. On or about January 2025, the USPIS in conjunction with the Federal Bureau of Investigation (FBI), and Federal Housing Finance Authority - Office of Inspector General (FHFA-OIG) received information and began investigating a Cincinnati-based multi-family real estate investment company called Vision & Beyond, LLC (V&B) and its owners, Grinberg and Gizunterman. Specifically, law enforcement received allegations from financial lenders and investors that V&B and its owners were involved in a large commercial mortgage fraud scheme, defrauding lenders for their own financial gain.

17. The following information is based upon information provided to law enforcement by lenders, open-source information, and information from Witness 1, a person involved in V&B's business dealings.[1]

18. Based on that information, V&B was engaged in the business of purchasing multi-family residential rental properties (*e.g.*, apartment buildings). To acquire the properties, V&B would solicit potential investors for investment funds. The investor funds, along with financial loans from lenders, would be used to facilitate the purchase of the properties.

---

[1] Law enforcement has interviewed Witness 1 in person on multiple occasions. Witness 1's name and identity are known to law enforcement, and certain information that Witness 1 has provided to law enforcement has been partially corroborated through claims filed by victims in civil court proceedings through Hamilton County, Ohio, as well as through discussions with financial lenders involved in certain transactions related to the fraud scheme. Based on the information that Witness 1 provided to law enforcement, Witness 1 appears to be implicated in V&B's criminal conduct. This affidavit does not set forth all information provided by Witness 1 or recite Witness 1's statements to investigators verbatim. Rather, the information contained in this affidavit attributable to Witness 1 is relayed in substance and in part.

19. According to Witness 1, Grinberg and Gizunterman began to acquire several multi-family commercial properties in Ohio, Kentucky, Indiana, and Texas. Grinberg and Gizunterman began to "double pledge"[2] properties to obtain financial loans through different lenders for financial gain. Grinberg and Gizunterman were able to do this with the assistance of two closing agents who were complicit in the scheme.

20. Witness 1 indicated that Grinberg and Gizunterman started to falsify information on financial statements and loan applications in order to receive more financing from lenders. For example, Grinberg would change numbers on rent rolls (*i.e.*, documents showing the amount of rent collected) for properties Grinberg and Gizunterman were purchasing to appear more profitable to the lender.

21. Eventually, according to Witness 1, Grinberg and Gizunterman wanted to make more money and decided to obtain financial loans through different lenders using the same existing properties.

22. On some transactions, Grinberg and Gizunterman would defraud the lenders and investors by putting a mortgage or payout on a closing statement in order to close a transaction but then remove it at closing, unbeknownst to the lenders. Again, this was facilitated by co-conspirators at the closing companies. Grinberg and

---

[2] Law enforcement understands that, when a property is "double pledged," there are two unrelated lenders who each believe they are in the first lean position. In the event that the property goes into default, both lenders may try to foreclose on the property, but only one of them (typically, the lender with the oldest loan) would be considered in the first lien position.

6

Gizunterman would also instruct co-conspirators to leave mortgages off the title commitments so that the banks would be unaware of the existing mortgage.[3]

23. As part of the fraud scheme, Grinberg and Gizunterman also sold properties without consent of the investors or lenders for less than what they owed on the existing mortgages. Grinberg and Gizunterman directed co-conspirators to delay the property deeds from being recorded with their respective County.

## The Corevest Refinancing

24. In approximately December 2022, V&B sought to refinance a large number of properties and loans through a lender called Corevest American Finance, LLC (Corevest).

25. The transaction was structured as two separate loans for approximately 60 multi-family properties owned by V&B and Grinberg and Gizunterman through various Limited Liability Companies. The 60 properties were located in Hamilton County and Montgomery County, Ohio.

26. The plan for the transaction was to have all 60 of the properties moved into two companies created by V&B called Cincinnati Portfolio Holdings VNB I, LLC and Cincinnati Portfolio Holdings VNB II, LLC. These 60 properties would be collateral for the loans from Corevest.

27. The transaction was structured as two loans from Corevest and Grinberg and Gizunterman were the "Sponsors" for the loans.

---

[3] One potential motivation for concealing existing mortgages from lenders would be to induce the lenders to extend loans that they would be unwilling to offer if they had knowledge of prior debts that would inhibit the lenders' ability to foreclose upon and sell the property in the event of a default on the loan.

7

28. The first loan, known as VNB I Loan, was in the amount of $18,189,500.00. Under the VNB I loan agreement, 25 properties located in Montgomery and Hamilton County, Ohio were pledged for collateral.

29. The second loan, known as VNB II Loan, was in the amount of $18,047,000.00. Under the VNB II loan agreement, 35 properties located in Hamilton County, Ohio were pledged for collateral.

30. After closing, both loans were securitized into publicly traded bonds through a Real Estate Mortgage Investment Conduit (REMIC) Trust.

31. As part of the loan agreements, Grinberg and Gizunterman needed to deed all of the associated properties into their respective VNB I, LLC and VNB II, LLC, as a condition of closing, in order to receive the respective loan funds.

32. In July 2024, Grinberg and Gizunterman stopped paying the loans. Due to the loans being in danger of defaulting, a "special servicer" was appointed for the loans. A special servicer has power to act on behalf of the note holder, investigative why the loans are in default, and try to get them back on good standing. A special servicer can communicate directly with the sponsors and request property reports (to include rent rolls and property condition reports),

33. Around the time of the default on the loans, Grinberg and Gizunterman told the special servicer that they had to leave the United States and return to Israel to re-enlist with the Israeli Defense Force to fight in the war in Gaza, and that is why they stopped paying on the loans.

8

34. Grinberg and Gizunterman also stated they were actively trying to sell the properties and provided a purported sale agreement for approximately $42 million.

35. Default notices were sent to Grinberg and Gizunterman on September 20, 2024, but they did not respond. In November 2024, foreclosure proceedings were filed.

36. In the course of the foreclosure proceedings, the loan holder and special servicer began to review documents and noticed evidence of fraud in the underlying loan transactions. Specifically:

   a. A review of title for the 60 properties showed that most of the properties allegedly put up as collateral were not deeded and recorded to the borrowers, Cincinnati Portfolio Holdings VNB I, LLC and Cincinnati Portfolio Holdings VNB II, LLC, as required at the time of closing. With respect to the VNB II Loan, none of the properties had been transferred or secured as collateral. As a result, the VNB II Loan worth 18 million dollars is without collateral.

   b. The closing statements for the two loans represented that loan funds would be used to existing payoff mortgages on the properties. According to Witness 1, and unbeknownst to the lenders, the prior loans were not paid off and/or the properties were left with multiple mortgages.

   c. A "Partial Release of Mortgage" (PRM) had been recorded in connection with the VNB I Loan that appears to be fraudulent. Corevest confirmed that the name of the signatory on the PRM was a Corevest employee but neither the employee nor the signatory worked at Corevest for months.

9

> The significance of filing a PRM is it shows potential buyers and lenders that the property has a clear title and free of any existing debt. In regard to V&B, by filing fraudulent PRMs, V&B was able to claim the properties were free of debt but in reality, they were not.

37. Moreover, the purported sale agreement that Grinberg and Gizunterman provided to the lender in 2024 was fraudulent. The lender's counsel spoke to counsel who represented the potential buyer, and counsel for the potential buyer stated that the potential sale of the property was only for $24 million not the $42 million agreement provided by Grinberg and Gizunterman.

## **CONCLUSION**

38. Based on the foregoing facts, I request that the Court issue the proposed criminal complaint. There is probable cause to believe that violations of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud) and § 1014 (False Statements on Loan Applications) have been committed by Grinberg. Therefore, I respectfully request that an arrest warrant be issued authorizing the arrest of Grinberg.

Respectfully submitted,

*Nicole Lutz* (signature)

Nicole Lutz
Postal Inspector
United States Postal Inspection Service

Sworn and subscribed to before me by reliable electronic means, specifically, FaceTime video conference, in accordance with Fed. R. Crim. P. 4.1, on March __19__, 2025.

*Stephanie K. Bowman* (signature)

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE